**R. Fiske WHITNEY, Plaintiff,**
**v.**
**Virginia BRANN and Herbert**
**Brann, Defendants.**

**Civ. A. No. 74–11.**

United States District Court,
D. Delaware.

April 29, 1975.

1

R. Fiske Whitney, pro se.

Richard W. Pell of Tybout, Redfearn & Schnee, Wilmington, Del., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

LATCHUM, Chief Judge.

The plaintiff, R. Fiske Whitney, seeks to recover $250,000 from the defendants, who are his daughter and son-in-law, Virginia and Herbert Brann, for personal injuries which he allegedly sustained as a result of an unusual accident involving a horse owned by the defendants.

The separate issue of liability was tried by the Court without a jury on March 26, 1975. After carefully considering the sufficiency and weight of the testimony [1] adduced at trial, the demeanor and relationship of the witnesses who testified and the post trial memoranda filed by the parties, the Court makes the following findings of fact, conclusions of law and judgment.

### FINDINGS OF FACT

1. The plaintiff is a citizen of the State of New Jersey, the defendants are both citizens of the State of Delaware,[2] and the amount in controversy, exclusive of interest and costs, exceeds $10,000.

2. In the latter part of 1971, the defendants, having sold their home in Tenafly, New Jersey, moved to a small farm that they had purchased near Sandtown, Delaware. Shortly thereafter, they bought a cross-breed pony or horse,[3] named Rambidis for $100, from their neighbor, Mr. Gibson, as a riding horse for their eleven year son, Vinnie Brann ("Vinnie").

3. On Sunday, January 30, 1972, the plaintiff and his wife made a social visit to the farm. While so visiting, Vinnie asked his grandfather, the plaintiff, to come outside to watch him ride his horse which he had ridden on a number of occasions before.

4. Plaintiff agreed and proceeded outside with Vinnie and Herbert Brann to a corral adjacent to the horse stable. Vinnie coaxed Rambidis into the stable, haltered her and led her into the corral where she was bridled.

5. Vinnie usually rode Rambidis in a fenced in riding circle located a short distance from the corral. The plaintiff had been told by Herbert Brann that Rambidis was "green broke," meaning she was not completely broken-in. The plaintiff took the reins from Vinnie, who was leading Rambidis in the corral, and stated that Rambidis could be trained to follow directions by the pull of the reins without actually riding her. He then demonstrated his method by standing to the left of Rambidis and placing his right arm over her neck and shoulders to grasp the right rein in his right hand while holding the left rein in his left hand. In this manner he moved Rambidis forward at a walk while walking beside her and guided her head in the direction he wished her to proceed by the pull of the left or right rein.

6. After proceeding through the corral gate, plaintiff pulled on the right rein to turn her to the right in order to proceed toward the riding circle. After the turn he evened her up, proceeded a short distance, directed her to the left and then to the right again through the gate of the riding circle. As he again

---

1. Since the parties chose not to order a transcript, the trial testimony has not been transcribed.

2. In his complaint, the plaintiff merely alleges that he is a "resident" of New Jersey and that the defendants are both "residents" of Delaware. However, the defendants admitted in their answer that diversity of "citizenship" exists between the parties and the evidence adduced at trial demonstrated to the satisfaction of the Court that diversity exists and that the plaintiff's failure to explicitly plead the citizenship of the parties is attributable solely to his failure as a *pro se* plaintiff to recognize the jurisdictional significance between "resident" and "citizen." See Krasnov v. Dinan, 465 F.2d 1298 (C.A. 3, 1972) and Freedman v. Zurich Insurance Co., 264 F.Supp. 550 (W.D.Pa.1967).

3. Rambidis was variously described in the testimony as a pony or horse, a cross-breed of Shetland pony and Arabian stock. She had a rather full body, short legs, weighed in the neighborhood of 1,000 lbs. and had a height described from three and a half to four and a half feet at the saddle.

pulled on the left rein after entering the riding circle, Rambidis without warning fell to the left, knocking the plaintiff down and rolled upon plaintiff's chest. Vinnie testified that the horse just fell on top of his grandfather and that her feet actually went up in the air as she fell on her left side. Herbert Brann testified that either the horse stumbled or that the plaintiff stumbled and pulled Rambidis over onto him but that he was really not sure what happened.

7. Until the time of the accident, there was no evidence that Rambidis had ever rolled over, stumbled or fallen on or near anyone or that she had any propensity in that regard. Before Rambidis was purchased, Mr. Brann had once seen Mr. Gibson, her previous owner, pull Rambidis off her feet when he was circling her at a run at the end of a long rope. He had also observed Mr. Gibson do the same thing with one or more of Gibson's other horses. Mrs. Brann never observed Mr. Gibson pull a horse over in this manner but she had some recollection that she had heard that he had done so. On one other previous occasion she and Vinnie had observed Rambidis when running around alone in the corral fall as she rounded a corner. However, Mrs. Brann made no connection between that fall and the information she had learned that Gibson had one time pulled a horse over.

8. At no time before the accident did either defendant believe or have reason to believe from their observations of Rambidis that she had a proclivity to fall upon or roll upon any person standing nearby. To the contrary, they were sufficiently satisfied with Rambidis' harmlessness that they freely allowed their young son, Vinnie, to care for and ride Rambidis despite Mrs. Brann's general fear of all horses.[4] While Mrs. Brann testified that she was aware that Rambidis sometimes "nipped" and in her opinion was somewhat "wild," she nevertheless warned her father of these tendencies before the accident.

9. The plaintiff, on the other hand, claimed he was knowledgeable and had considerable experience with horses of which the defendants were aware. He had done a great deal of riding, owned a horse farm and at trial attempted to qualify himself as an expert witness on the training and management of horses. The plaintiff was also well aware at the time of the accident that the defendants were not very knowledgeable and had very little experience in the handling or care of horses.

10. Testifying as an alleged expert,[5] plaintiff stated that it was his opinion that Rambidis did not stumble because if she had stumbled she would have fallen forward and would not have rolled upon the plaintiff with her feet off the ground. Instead, he speculated in retrospect that by pulling Rambidis over Gibson had actually trained her to roll over. The plaintiff admitted that such training would have been very unusual, that the defendants with their limited experience would not have recognized such training or potential danger from seeing Gibson pull a horse off its feet, and that even he, with his wider experience, would not have realized the significance of Gibson's actions. Indeed, the plaintiff on one occasion did see Gibson pull a horse off its feet (although he did not know whether or not it was Rambidis) and he just assumed that Gibson was aggravated with the horse so that he failed to relate the event with any dan-

---

4. It was obvious from Mrs. Brann's testimony that she had very little experience or familiarity with horses, had never ridden one and was generally distrustful and fearful of such animals.

5. While obviously the plaintiff had more experience with horses than the defendants, the Court is unconvinced that his experience was sufficient to qualify him as an expert on the subject. Furthermore, although he was permitted to give his opinion as to how the accident happened, since he was representing himself at trial, the Court is unable to attribute much weight to his opinion and theories as to how or why the accident occurred.

ger. When Mr. Brann observed Gibson do this, he thought Gibson was just "showing off."

11. Following the accident, Rambidis' potential for causing injury was recognized as evidenced by the fact that she was sold for a loss and in response to Mrs. Brann's intensified antagonism to horses in general, even a very gentle and well-trained horse which the defendants owned was sold.

12. The plaintiff admitted that the defendants did not willfully or intentionally mislead the plaintiff as to Rambidis' disposition.

13. There was also testimony concerning plaintiff's alleged payment for his social visits to his daughter's farm. Plaintiff testified that in recognition of the fact that the defendants had a substantially lower income after moving to the farm, he often gave his daughter financial aid to offset the expenses of his visits. While plaintiff's checks to Mrs. Brann were admitted in evidence, all were dated quite some time after the date of the accident. Mrs. Brann testified, however, that she never asked for any money, would not have charged her father for her hospitality, at times took money offered under protest and in fact her father had on occasions given her money when she lived in New Jersey before moving to the farm.

## CONCLUSIONS OF LAW

1. Jurisdiction exists by virtue of 28 U.S.C. § 1332.

2. This being a diversity suit, the tort law of Delaware where the accident occurred governs this case. Fulginiti v. Tocco, 462 F.2d 654, 655, fn. 1 (C.A. 3, 1972).

3. Plaintiff claimed in his complaint and at trial that the defendants were negligent in failing to warn him of Rambidis' known dangerous propensity to suddenly fall and roll over on her left side onto whatever may be in her way by a simple pull to the left on the halter or bridle of the horse.

4. It has long been the established law of Delaware that the owner of a domestic animal, such as a horse, is not liable for injuries done by it unless it was in fact and to the owner's knowledge vicious or in some manner dangerous. Brown v. Green, 1 Penne 535, 42 A. 991 (Del.Super.1899); F. Giovannozzi & Sons v. Luciani, 2 Terry 211, 18 A.2d 435 (Del.Super.1941); Duffy v. Gebhart, 157 A.2d 585, 586 (Del.Super. 1960); Richmond v. Knowles, 265 A.2d 53, 55 (Del.Super.1970). Scienter or knowledge of the dangerous propensity of a domestic animal may come to an owner either from actual knowledge, from observation, or from reports made to the owner of its dangerous disposition or habits or it may be gathered or known constructively, for example, if the animal had a reputation in the neighborhood of possessing a dangerous inclination. Friedman v. McGowan, 1 Penne 436, 42 A. 723, 725 (Del.Super.1898); Barclay v. Hartman, 43 A. 174 (Del.Super.1896).

5. First, plaintiff has failed to prove by a preponderance of credible evidence that Rambidis in fact possessed the alleged dangerous habit of falling and rolling over whenever her rein was pulled to the left. The only suggestion of this trait was the highly speculative theorizing of the plaintiff that Gibson, her previous owner, had trained Rambidis to perform this "trick." There is insufficient factual support for any such assumption. Gibson was not called to testify in support of this theory and the one occasion, when Rambidis was observed to have been pulled off her feet by Gibson, would unquestionably have been inadequate training to teach a horse to perform such a "trick" by the simple tug of the rein. If pure speculation were in order to determine why and how the accident occurred, it would be equally reasonable to assume (1) that Rambidis had a weak left front quarter which caused her leg to give way and fall, or (2) that she simply stumbled and fell, or (3) that plaintiff stumbled and

catching Rambidis off-balance pulled her over. The roll after the fall is equally explained as the usual manner in which a horse regains momentum for righting itself in order to get into a position to stand again. Plaintiff's pure speculation and guess work that Rambidis possessed a dangerous trait which caused his injuries is totally inadequate to warrant fixing of liability upon the defendants. This is so because negligence is never presumed; it must be proved; and no presumption of negligence arises from the mere fact that an accident occurred. Wilson v. Derrickson, 4 Storey 199, 175 A.2d 400, 401–2 (Del.Sup.1961). Thus, the Court concludes that plaintiff has failed to carry his burden of proof with respect to one of the essential issues in this case, viz., that Rambidis in fact possessed the dangerous inclination to fall and roll as speculated by the plaintiff.

■ 6. Second, even if the Court were to assume (which it legally may not do) that Rambidis had been trained to perform the trick of falling and rolling upon the tug of the left rein, the plaintiff has failed to meet his burden of proving by a preponderance of the evidence a second essential fact that the defendants had knowledge of any such dangerous trait as the performing of the trick. No credible evidence was presented to show that the defendant actually knew that Rambidis was dangerous in this respect. Indeed, the plaintiff admitted that the defendants were unaware of any such proclivity. But even in the absence of such an admission, the evidence was overwhelming that defendants were totally unaware of any such assumed propensity. First, this is shown by the evidence that the defendants allowed their son to play with and ride Rambidis many times before the accident, acts totally at odds with any assumption that the defendants knew the horse was dangerous. Second, the defendants warned the plaintiff that Rambidis was only "partially trained," sometimes "nipped" and was a "bit wild." These warnings, coupled with plaintiff's admission that there was no malice between the parties, convinces the Court that they constituted the full extent of defendant's actual knowledge of any dangerous habit or inclination on Rambidis' part. Third, the plaintiff admitted that with defendants' limited knowledge of horses, he did not believe that knowing Gibson had pulled her over and Mrs. Brann seeing Rambidis fall once in the corral meant anything to them.

■ 7. The plaintiff also appears to contend that since Mr. Brann had observed Rambidis pulled off her feet by Gibson while he was running her in a circle at the end of a long rope and since Mrs. Brann had noticed Rambidis fall as she turned a corner while running around alone in her corral was enough to imply constructive knowledge to them, as reasonable persons, of the alleged dangerousness of Rambidis. This contention has as its sole basis plaintiff theorizing as an alleged horse expert that if a horse is pulled off its feet once it is easier to pull the horse over a second time, that eventually with such training the horse can be pulled over with the slightest tug on the rein or no signal at all, and that reasonable persons should have realized this was a trick taught to Rambidis by Gibson and that the trick was dangerous.

There are three fatal defects to plaintiff's contention. First, the plaintiff has completely failed to prove to this Court that he was sufficiently experienced in the training of horses to testify as an expert. To the contrary, he admitted he was a "mediocre horseman," not "full fledged." While he had occasionally observed the training of young horses and had discussed their training with full-time horse trainers, he failed to indicate he had any personal experience with or ever witnessed teaching such a "trick" to horses as here contended. Indeed, the first time he had ever observed a horse pulled off its feet was

when he had seen Gibson do it and he had then assumed that Gibson was simply annoyed at the horse.

Second, even if a horse could be trained in the manner theorized by the plaintiff, there is no evidence of record that either defendant saw or heard that Rambidis was progressively easier to pull over. In fact, neither defendant testified to seeing Rambidis repeatedly pulled over as would be necessary under the plaintiff's theory. Moreover, there is no evidence that the fall witnessed by Mrs. Brann was in any way connected to the alleged training by Gibson and instead not connected to some latent physical weakness or characteristic of the horse.

Third, even if the defendants had seen Rambidis pulled over repeatedly by Gibson the plaintiff has failed to prove that a reasonable man should connect this with any danger resulting from the horse rolling over on its own or with a slight tug when a man was in close proximity to the animal so as to cause the injuries alleged in this case. There is no evidence that the horse before the accident ever rolled over from a slight tug. There is no evidence that the horse before the accident ever rolled over near a man so as to suggest a potential danger. There is no evidence that a man of ordinary prudence should be aware of the plaintiff's self-serving training theory; to the contrary even the plaintiff was unaware of the theory at his deposition before trial and there was an admission at trial by the plaintiff that even then he possibly would not have re-

alized the danger if told of all the events witnessed by the defendants.[6]

Accordingly, the Court concludes that the plaintiff has failed to prove by a preponderance of the evidence that, persons of ordinary prudence, witnessing the events seen and heard by the defendants would have known or realized that Rambidis had any such propensity for danger as alleged.

■ 8. For the reasons above stated, the Court concludes that the plaintiff has not sustained his burden of proving that (a) Rambidis possessed the dangerous propensity alleged or (b) even if Rambidis did have such a dangerous proclivity, that the defendants had actual or constructive notice and knowledge thereof which would render them liable to the plaintiff.

■ 9. Finally and alternatively, even if the plaintiff had succeeded in sustaining his burden of proving that Rambidis had the dangerous proclivity alleged, that the defendants had knowledge of the danger and were found to have been negligent in failing to warn plaintiff thereof, plaintiff's recovery would nevertheless be barred by 25 Del. C., 1953, § 1421, which at the time of the accident provided:

"No person who comes onto premises occupied by another person as his guest without payment shall have a cause of action for damages against the occupier of the premises unless such accident was intentional on the part of the occupier or was caused by his wilful or wanton disregard of the rights of others." [7]

---

6. While the plaintiff placed considerable emphasis that after the accident Mrs. Brann stated she should have known Rambidis would do something like that, the Court, in consideration of all the factors in this case, concludes that this statement should be treated as a retrospective affirmation by Mrs. Brann of her general fear of horses and not as an admission that she, as a reasonable person, should have prospectively been convinced from the fragmentary evi-

dence concerning Rambidis that the horse was dangerous in the respect alleged.

7. The statute was amended effective July 10, 1973 and now reads (25 Del.C., Rev.1974, § 1501):

"No person who enters onto the premises owned or occupied by another person, either as a guest without payment or as a trespasser, shall have a cause of action against the owner or occupier of such

A "guest without payment" has been construed by the Delaware courts to be akin to a "social guest" recognized at common law as distinguished from "business invitee." Facciolo v. Facciolo Construction Co., 317 A.2d 27, 28 (Del. Sup.1974); Urbanski v. Walker, 281 A. 2d 491, 492 (Del.Sup.1971). Thus, when a person confers some economic or other benefit of value on the owner of premises, he is not usually considered a guest without payment. Richmond v. Knowles, 265 A.2d 53, 56 (Del.Super. 1970); Hoksch v. Stratford Apartments, Inc., 283 A.2d 687, 688 (Del.Super.1971). An important distinction, however, must be made between those cases involving an "enforceable agreement" to pay expenses in connection with a visit and those in which there is merely a voluntary payment of expenses not in liquidation of a contractual liability but in return for favors of a host as a matter of social amenity, as for illustration, by paying for a meal. In the latter cases the person is considered a "guest without payment" and the statute applies. Asmuth v. Kemper, 174 A.2d 820, 823 (Del.Super.1961).[8]

The evidence in this case is unclear whether the plaintiff gave his daughter any money towards his expenses on the date of his injury. But even if he did, the Court is unable to conclude that he is beyond the application of the statute. The evidence shows: that the defendants' farm was never run for the purpose of hosting paying guests; that none of defendants' visitors ever paid to stay at the farm; plaintiff was never asked for money and at times his daughter accepted only over protest. Plaintiff never gave any fixed amount to defendants and he was welcome as a father and grandfather with or without his gifts. Furthermore, money was given at other times as gifts to the defendants' children as one would normally expect from a grandfather.

As a result of this evidence and in view of the applicable law, the Court finds that any money given to Mrs. Brann was not in accordance with any prearranged agreement or in liquidation of a contractual liability but rather as a matter of social amenity and pure gratuity to his family. The Court also concludes from the evidence that plaintiff's visit conferred no benefit of value upon defendants which others in like situations would have to pay. Accordingly, the Court concludes that the plaintiff on the date of the accident was a "guest without payment" within the meaning of 21 Del.C., 1953, § 1421 when visiting the defendants' farm. Thus, to recover plaintiff was required to prove by a preponderance of the evidence that the injuries he sustained as a result of the accident were intentional on the part of the defendants or were caused by their willful or wanton[9] disregard of his

---

premises for any injuries or damages sustained by such person while on the premises unless such accident was intentional on the part of the owner or occupier or was caused by the willful or wanton disregard of the rights of others."
Although this amendment represents some significant changes these changes do not affect this case.
In addition, the accident occurred on January 23, 1972 and, accordingly, is not governed by the terms of § 1501. See Pietuszka and Gallucio Builders, Inc. v. McTaggart, 333 A.2d 164 (Del.Sup.1975).

8. While the Court in *Asmuth* was considering the Delaware automobile guest statute, 21 Del.C. § 6101, the Delaware Supreme Court has equated the term "guest without payment" used in that statute to the same term in § 1421. Stratford Apartments, Inc. v. Flemming, 305 A.2d 624, 626 (Del.Sup. 1973).

9. "Wilful conduct, by definition, includes an element of actual or implied intent to cause injury. Wanton conduct occurs when a person, though possessing no intent to cause harm, performs an act which is so unreasonable and dangerous that an imminent likelihood of harm or injury to another is reasonably apparent. Wagner v. Shanks, Del. Supr., 194 A.2d 701, 707 (1963). Such conduct is often characterized by a conscious indifference to the consequences of one's acts or by an 'I-don't-care-a-bit-what-happens' attitude. McHugh v. Brown, Del.Supr., 11 Terry 154, 125 A.2d 583, 586 (1956)." Schorah v. Carey, 318 A.2d 610, 612 (Del. Super.1974).

rights. Since there was absolutely no evidence of this type of conduct on the part of the defendants, plaintiff has failed to sustain his burden under the statute.

10. Finding that the plaintiff has failed to establish by a preponderance of the evidence that the defendants are legally liable for the accident and injuries sustained by the plaintiff, the Court will enter judgment against the plaintiff and in favor of the defendants. .

### JUDGMENT

It is ordered that judgment is hereby entered in favor of the defendants and against the plaintiff.